UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-80786-CIV-DIMITROULEAS/MATTHEWMAN

LORI ANNE IACOVETTA,

     Plaintiff,

v.

ANDREW M. SAUL,
COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

_____/

FILED BY_____KJZ_____D.C.

Jul 6, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT [DEs 21, 24]

THIS CAUSE is before the Court upon Plaintiff, Lori Anne Iacovetta's ("Plaintiff") Motion for Summary Judgment [DE 21] and Defendant, Andrew Saul, Commissioner of Social Security's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment [DEs 24, 25]. Plaintiff has filed a Reply [DE 26]. This matter was referred to the undersigned by United States District Judge William P. Dimitrouleas. [DE 5]. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I. INTRODUCTORY STATEMENT

This case presents a somewhat unique and relatively confusing factual scenario. On April 19, 2017, Plaintiff filed a Title II application for a period of disability and disability insurance

1

benefits, alleging disability beginning on March 15, 2011. Plaintiff later amended her alleged onset date to December 18, 2013, the day after a prior unfavorable decision by a different Administrative Law Judge ("ALJ"). The ALJ in the case at hand determined that Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2016. Thus, the relevant time period for the case at hand is December 18, 2013 through September 30, 2016.

Despite the limited time period at issue, there are numerous records which pre-date or post-date the relevant, undisputed time period. This has caused both the Court and the parties some confusion. While the Court has carefully reviewed the entire record in this case, certain medical records appear to be immaterial to the issue of whether Plaintiff suffered from a disability pursuant to the Social Security Act during the relevant time period, while others appear to be relevant even though they are outside of the relevant time period.

The undersigned further notes that Plaintiff has waived any arguments concerning her physical limitations, as she has only made argument about her mental limitations in her papers.

## II. FACTS

On April 19, 2017, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning on March 15, 2011. [R. 15].[1] Plaintiff's counsel later amended the onset to December 18, 2013, the day after a prior unfavorable decision by an ALJ. [R. 15, 28]. The claim filed on April 19, 2017 was denied initially on August 3, 2017 and again upon reconsideration on November 13, 2017. [R. 15]. Following a video hearing on August 9, 2019, the ALJ, Edward Malvey, issued a decision on August 27, 2019, denying

---

[1] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 18.

Plaintiff's request for benefits. [R. 12-20]. A request for review was filed with the Appeals Council and denied on March 20, 2020. [R. 1-9].

## A.  Hearing Testimony

At the time of the August 19, 2019 video hearing, during which she was represented by counsel, Plaintiff was 42 years old. [R. 30]. The ALJ had a vocational expert, Dr. James Soldner, attend the hearing by phone. [R. 27].

Plaintiff is a high school graduate, but she took special education classes throughout her schooling. [R. 31, 36]. She has a valid driver's license and can drive when she is not feeling too anxious. [R. 31]. Plaintiff lives with her mother and brother and does not work or volunteer. [R. 31]. She previously worked at Giovani's Pizza cleaning, hosting, serving drinks, preparing food, and serving some food. [R. 32]. Serving food and working as a hostess made her too anxious. [R. 32]. Plaintiff lifted 5-10 pounds but had trouble balancing trays due to her crooked finger. [R. 32].

Plaintiff has trouble sleeping. [R. 33]. During a typical day, she watches television and movies and lets her dog out. [R. 33]. She also tries to do some housework but can only do it for a few minutes at a time before her back pain and other aches and pains force her to rest. [R. 33-34]. Plaintiff sweeps and does some dishes. [R. 34]. She does not walk much, except for when she is in the supermarket, because it is hard for her. [R. 34]. Plaintiff goes to the supermarket a couple of times per week and often goes alone. [R. 34].

When Plaintiff deals with people, she sometimes gets panic attacks. [R. 34]. She suffers from anxiety and becomes overwhelmed, even when at the grocery store. [R. 34]. She uses a food stamp card. [R. 34]. Plaintiff is unable to handle her finances, but she can deposit and withdraw funds. [R. 35]. She can read but has trouble with comprehension. [R. 35]. Plaintiff does not see

any friends. [R. 35].

Plaintiff takes prescribed medication as needed for her anxiety. [R. 36]. She had a panic attack on the day of the hearing. [R. 36].

The vocational expert was not asked to testify at the hearing by the ALJ.

## B.  Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits in the case at hand, the ALJ reviewed the medical evidence of record. Only the medical evidence of record, which is relevant to the issues on appeal, is summarized chronologically below.

Plaintiff received an unfavorable decision from an ALJ in a separate case on December 17, 2013. [R. 38-57]. The ALJ in that case found that Plaintiff suffered from the following severe impairments: bipolar disorder, anxiety, depression, and asthma. [R. 43]. However, the ALJ found that Plaintiff was not disabled. [R. 51]. In reaching her decision, the ALJ considered medical records from 2002 to 2013. [R. 56-57]. The Appeals Council denied Plaintiff's request for review on March 9, 2015. [R. 58-63].

Plaintiff began seeing Dr. Dennis J. Egitto, an internist, in 2002. Relevant to the Court's decision-making in this case, she saw him on April 21, 2017. [R. 247, 284]. While the doctor's notes are somewhat illegible, they do appear to state that Plaintiff complained of depression, anxiety, and insomnia, as well as difficulty with speech, trouble focusing, gastrointestinal distress, and problems understanding. [R. 247, 284]. He prescribed medication for her depression, bipolar disorder, and insomnia. [R. 247, 284]. Dr. Egitto also prescribed additional medication on May 10, 2017. [R. 247, 284]. On June 21, 2017, Dr. Egitto noted that Plaintiff had been exposed to black mold. [R. 250]. He also increased her medications. [R. 250]. On July 10, 2017, Dr. Egitto noted

4

Plaintiff's self-reported symptoms and altered her medications. [R. 250]. Dr. Egitto also treated Plaintiff on August 1 and 23, 2017 and on September 20, 2017. [R. 285-287]. Finally, there are additional illegible treatment notes by Dr. Egitto from 2017, 2018, and 2019. [R. 314-16, 329-32].

On September 27, 2017, October 3, 2017, and October 5, 2017, Joan T. Cooper, PhD, a licensed psychologist, performed a psychological evaluation on Plaintiff. [R. 294-301]. Plaintiff was referred to Dr. Cooper by the Florida Department of Education Vocational Rehabilitation for differential diagnosis and to assist with the eligibility process. [R. 300]. Dr. Cooper observed the Plaintiff for a cumulative total of approximately nine hours, interviewing and testing Plaintiff. [R. 295-96]. Dr. Cooper noted Plaintiff's behaviors were generally consistent during each session. [R. 296, 300]. Her affect was constricted with a depressed and anxious quality, and her mood appeared dysthymic. [R. 300]. However, Plaintiff's memory functions were intact, and she could display adequate attention to complete tasks, though she required prompting and instructions to be repeated. [R. 296]. Plaintiff's speech was generally clear and coherent but repetitive and mildly disorganized. [R. 296].

Testing determined Plaintiff's IQ score to be 61, which is considered in the extremely low range of intellectual functioning. [R. 297]. Her verbal comprehension index score was 78, which is considered to be in the borderline range. [R. 297]. Plaintiff's working memory index, perceptual reasoning index, and processing speed index scores were in the extremely low range. [R. 297-98]. Plaintiff's overall functioning and academic skills were estimated to be in the well below average range. [R. 298]. Dr. Cooper noted that the testing results may be considered a broad estimate of Plaintiff's current psychological functioning, as her sensory and emotional issues may have impeded her performance in some areas. [R. 300]. Plaintiff's neuropsychological screening index

score placed her in the moderately to severely impaired range. [R. 299]. Plaintiff's Personality Assessment Screener score showed a marked risk of experiencing clinical problems substantially greater than is typical and showed significant elevations in the following areas: negative affect, anger control, health problems, social withdrawal, psychotic features, and alienation. [R. 300-301].

Dr. Cooper opined that the Plaintiff is not an appropriate candidate for gainful employment and/or independent living. [R. 301]. She explained that Plaintiff's moderate to severe intellectual, cognitive processing, neuropsychological, adaptive, achievement, and emotional and behavioral deficits place her at significant risk for severe problems in the workforce and high potential for social exploitation. [R. 301]. Dr. Cooper recommended referring Plaintiff to community programs for disabled, case management, and psychiatric care. [R. 301]. She further recommended that Plaintiff should pursue SSI disability with her attorneys as the results of the evaluation clearly indicate that she would meet the criteria for these benefits. [R. 301.] Dr. Cooper's diagnoses were bipolar II disorder, social anxiety, agoraphobia, unspecified neurodevelopmental disorder, intellectual disability (mild), and personal history of sexual abuse in childhood. [R. 301].

On January 16, 2018, Plaintiff had a brain MRI which showed evidence of corpus callosum agenesis/dysgenesis. [R. 303]. There was evidence of enlargement of the lateral ventricles. [R. 303]. It was determined that there was probably a very small portion of the genu of the corpus callosum that was still present given the appearance of the frontal horns of the lateral ventricles. [R. 303]. There was evidence of relative atrophy of the right frontal lobe and of an old VP shunt in the right frontal lobe. [R. 303]. In some of the images, there was unconfirmed evidence of an arachnoid cyst in the right medial parafalcine. [R. 303]. The overall MRI impression was a genesis/dysgenesis of the corpus callosum with dilation of the lateral ventricles. [R. 303].

On January 26, 2018, Plaintiff presented to the Jerome Golden Center for Behavioral Health after her social security attorney referred her there. [R. 311]. She reported general anxiety, depression, lack of concentration and focus, hyper and aggressive behavior when her mood is "high," and staying in bed all day other times. [R. 311]. It was recommended that Plaintiff follow up with a psychiatrist and a therapist. [R. 313].

On March 5, 2018, Plaintiff presented to Dr. Jung Kim at the Jerome Golden Center. [R. 307]. She was diagnosed with unspecified mood (affective) disorder, unspecified anxiety disorder, and unspecified developmental disorder of scholastic skills. [R. 308]. Plaintiff was given a comprehensive mental status exam and was found to have an anxious, labile, and despairing mood and appropriate affect. [R. 309]. Dr. Kim determined that Plaintiff was alert; was aware of time, place, and person; was able to concentrate; had intact judgment and insight; had average intelligence; had intact memory function; had no issue with thought or perception; had normal speech; and had issues with sleeping and appetite. [R. 309]. Dr. Kim noted that Plaintiff was taking Xanax as needed. [R. 309]. Dr. Kim further noted that Plaintiff had mood swings, anxiety, depression, difficulty dealing with surroundings, and sleep disturbances. [R. 310].

On April 3, 2018, Plaintiff again presented to Dr. Jung Kim at the Jerome Golden Center. [R. 305]. She reported her symptoms and explained that she needed to receive social security to pay for her medical treatment and to help her family. [R. 305]. The medical record states that "Dr. Kim does not want to see patient anymore." [R. 305].

On May 1, 2018, Plaintiff presented to Dr. Mehrunnisa Sultana at the Jerome Golden Center for a follow up appointment. [R. 319]. She had difficulty responding to questions and comprehending and retaining information. [R. 319]. It was unclear if she had been taking her

7

prescribed medications. [R. 319]. The doctor prescribed Citalopram and Trazodone but did not prescribe Xanax. [R. 319].

On July 10, 2018, Dr. Cooper wrote a letter stating that she had evaluated Plaintiff and that Plaintiff met the Americans with Disabilities Act criteria for a person living with multiple disabilities. [R. 328]. Dr. Cooper opined that, due to Plaintiff's permanent disabilities, she would not be capable of participating in gainful employment, and therefore, will require Social Security disability benefits. [R. 328].

On May 20, 2019, Dr. Egitto completed a physical residual functional capacity questionnaire. [R. 324-25]. He noted that he sees Plaintiff every 3 to 6 months. [R. 324]. Plaintiff's diagnoses included bipolar disorder, high blood pressure, and agenesis corpus collosum, and Dr. Egitto's prognosis regarding the Plaintiff was guarded. [R. 324]. Dr. Egitto stated that Plaintiff's pain is constantly a 6-7/10, and activity and breathing affect her pain. [R. 324]. He noted that Plaintiff has pain and tenderness over her chest wall, knee, and ankle. [R. 324]. He also noted that Plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described in the evaluation and that emotional factors contribute to the severity of her symptoms and functional limitations. [R. 324].

According to Dr. Egitto, during the day, Plaintiff constantly experiences pain or other symptoms which are severe enough to interfere with attention and concentration needed to perform even simple work tasks. [R. 325]. Plaintiff's ability to sit is limited to 15 minutes, and her ability to stand is limited to 5 to 10 minutes at one time. [R. 325]. Her abilities to sit and stand/walk are limited to less than two hours in an eight-hour workday. [R. 325]. She needs to walk for 10 minutes in an eight-hour workday, for two minutes each time. [R. 325]. Plaintiff needs to shift positions at

will between sitting, standing, or walking. [R. 325]. She needs to repeatedly take unscheduled breaks during an eight-hour workday. [R. 325]. She can lift 10 pounds rarely and should never lift over 10 pounds. [R. 326]. She can rarely look down and hold her head in a static position and can occasionally turn her head right or left and look up. [R. 326]. Plaintiff can rarely twist, stoop, crouch, or squat, and she can never climb ladders or stairs. [R. 326]. Plaintiff only has bad days due to her impairments. [R. 327]. She would likely be absent from work as a result of her impairments more than four days per month. [R. 327]. She has a fear of leaving the house, difficulty expressing herself, shortness of breath, and a persistent cough. [R. 327]. Dr. Egitto opined that, within a reasonable degree of medical certainty, Plaintiff's limitations were applicable prior to September 30, 2016 and have since continued. [R. 324-27].

On June 24, 2019, Plaintiff presented to Family Counseling Associates, Inc. for outpatient mental health treatment in hopes of alleviating her depression. [R. 346]. It was noted that Plaintiff was trying to get social security disability payments, that her mother and brother have received benefits due to mental illness, and that she cannot work due to her mental illness. [R. 346].

On July 22, 2019, Plaintiff again presented to Family Counseling Associates, Inc. for outpatient mental health treatment. [R. 339]. She sought an increased ability to manage stressful circumstances. [R. 339]. Nancy Steinfeld, LCSW, determined that Plaintiff's mood was dysphoric; her affect was depressed and anxious; her participation was responsible and interactive; and she had improved understanding of what was happening. [R. 342]. A treatment plan for weekly individual therapy was recommended. [R. 339].

### C. **ALJ's Decision**

The ALJ issued his decision on Plaintiff's claim for benefits on August 27, 2019. [R. 12-20]. The ALJ first found that Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2016, and that she did not engage in substantial gainful activity during the period from her alleged onset date of December 18, 2013 through the date last insured of September 30, 2016. [R. 17]. The ALJ then found that, through the date last insured, Plaintiff suffered from the following medically determinable impairments: obesity, absence of corpus callosum, bipolar disorder, and learning disorder. [R. 17]. The ALJ determined that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months, so she did not have a severe impairment or combination of impairments pursuant to 20 CRF 404.1525, *et seq.* [R. 17]. The ALJ explained that he had considered all of Plaintiff's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. [R. 17].

The ALJ explicitly considered Plaintiff's medical records and testimony and found that Plaintiff's "medically determinable impairments could have been reasonably expected to produce the alleged symptom; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." [R. 18-19]. The ALJ specifically discussed the record evidence and explained that evidence dating prior to December 18, 2013 was of minimal relevance. [R. 19]. He further noted that the record "lacks objective exam findings of any physical or mental limitations during the relevant period." [R. 19].

The ALJ also considered the four areas of mental functioning required for evaluating mental disorders and found that Plaintiff had failed to meet her burden of establishing the existence of more than minimal limitation of any of the "Paragraph B" criteria. [R. 19-20]. Therefore, the medically determinable mental impairments are non-severe. [R. 20]. The ALJ concluded that Plaintiff was not under a disability from December 18, 2013 through September 30, 2016. [R. 20].

### III. <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In her Motion for Summary Judgment, Plaintiff makes three general arguments. [DE 21]. First, she argues that the ALJ failed to properly consider the opinions of two of her treating physicians. Second, she contends that the ALJ erred in finding that her learning disorder is not a severe impairment. Third, she maintains that the ALJ failed to perform a proper psychiatric review technique analysis.

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment, Defendant asserts that the ALJ's decision is supported by substantial evidence. [DE 24]. And to the extent the ALJ erred, such error was harmless.

In reply, Plaintiff argues that none of Defendant's arguments show that the ALJ's decision was supported by substantial evidence. [DE 26].

The parties' arguments are discussed in more detail below.

### IV. <u>RELEVANT LAW</u>

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a

reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must, first, determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are

so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. To determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

## V. <u>ANALYSIS</u>

A.  <u>Whether the ALJ Improperly Rejected the Opinions of Drs. Egitto and Dr. Cooper</u>

Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Egitto and Dr. Cooper on the bases that they were either from before or after the relevant time period, did not reflect Plaintiff's functioning during the relevant time period, and were inconsistent with or unsupported by objective exam findings. [DE 21, p. 9]. Plaintiff points out that "Dr. Egitto specifically stated that the limitations he outlined were applicable to the Plaintiff prior to September 30, 2016, within a reasonable degree of medical certainty." *Id.* at pp. 9-10. Plaintiff also asserts that the opinion of

a treating physician warrants a significant weight, especially the opinion of a doctor, such as Dr. Egitto, who treated Plaintiff during the relevant time period. *Id.* at p. 10. Plaintiff acknowledges that Dr. Cooper evaluated her a year after her date last insured, but she emphasizes that Dr. Cooper based her opinion in part on the Plaintiff's IQ testing, and an IQ score remains constant throughout a lifetime. *Id.* Finally, Plaintiff contends that the opinions of Dr. Egitto and Dr. Cooper are consistent with and supported by objective exam findings. *Id.* at pp. 10-11.

In response, Defendant explains that Dr. Egitto was Plaintiff's treating family physician, and Dr. Cooper was a non-treating, examining psychologist who performed three days of psychological testing. [DE 24, p. 9]. Defendant argues that the ALJ's explanation for giving the opinions little persuasive value was sufficient under the Social Security regulations. *Id.* Defendant also contends that the medical record supports the ALJ's determinations that Dr. Egitto's medical opinion was not supported by objective examination findings and that his opinion did not reflect Plaintiff's functioning during the relevant time period. *Id.* at p. 11. As for Dr. Cooper's opinion, Defendant asserts that "opinions from a one-time examining doctor are not entitled to deference or special consideration." *Id.* at p. 12. Defendant also argues that Plaintiff presented minimal evidence in support of her case. *Id.* at pp. 12-13. Finally, Defendant contends that the ALJ "essentially indicated that Dr. Cooper's opinion of moderate to severe intellectual and cognitive deficits was not wholly supported by or consistent with the record (Tr. 19, 301), both of which are 'good reasons' for affording the opinion diminished weight." *Id.* at p. 13.

In reply, Plaintiff asserts that Dr. Cooper presented valid objective testing and evaluation which revealed limitations due to intellectual disability, and it does not matter that this testing took place after the relevant time period since an individual's IQ score does not change throughout her

lifetime. [DE 26, p. 3].

The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion" but is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 F. App'x. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The law regarding how much deference to give treating physicians has changed for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1527. Here, Plaintiff's claim was filed after March 27, 2017. The new regulations, which omit entirely the term "treating source," state that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." § 404.1520c(a). Instead, all medical opinions are to be evaluated according to the factors listed in § 404.1520c(c), of which the most important are the supportability and consistency of the medical opinion. *See id.* Moreover, the Commissioner is not required to articulate how it "considered each medical opinion or prior administrative medical finding from one medical source individually." 20 C.F.R. § 404.1520c(b)(1).

Supportability refers to the relevance of "the objective medical evidence and supporting explanations presented by a medical source ... to support his or her" opinion. 20 C.F.R. § 404.1520c(c)(1). Consistency looks to whether "the evidence from other medical sources and nonmedical sources in the claim" are consistent with the medical opinion presented. 20 C.F.R. § 404.1520c(c)(2). The other factors, which the ALJ is not required to consider, § 404.1520c(b)(2), concern the medical source's relationship with the claimant, § 404.1520c(c)(3), the medical source's specialization, § 404.1520c(c)(4), and any "other factors that tend to support or contradict

a medical opinion," § 404.1520c(c)(5); *see also Bonilla v. Saul*, No. 19-25323-CIV, 2020 WL 9048787, at *4–5 (S.D. Fla. Oct. 23, 2020), *report and recommendation adopted*, No. 19-CV-25323, 2021 WL 1198296 (S.D. Fla. Mar. 30, 2021).

Thus, under the revised regulations, which the Court is applying in this case, the ALJ must articulate how persuasive he or she finds the medical opinions in the record and specify how he or she considered the supportability and consistency factors for a medical source's opinion. *See* 20 C.F.R. § 404.1520c(b). If the ALJ finds that two or more medical opinions are equally well-supported and consistent with the record but are not necessarily the same, the ALJ must articulate how it considered other persuasive factors. *See* 20 C.F.R. § 404.1520c(b)(3).

In the ALJ's decision, he explained that "[t]he record contains multiple opinion statements from Dr. Egitto and Dr. Cooper, but these date from prior to or after the relevant time period and are thus of little persuasive value as they do not reflect the claimant's functioning during the period at issue. Moreover, they are not consistent with or supported by objective exam findings." [R. 19]. The ALJ then summarized the record evidence. [R. 19].

The ALJ was only required to explain how he considered the factors of supportability and consistency (unless, of course, he found that two or more medical opinions on the same issue were both equally well-supported and consistent with the record). The ALJ complied with the revised Social Security regulations and provided several reasons to discount the physicians' opinions. Therefore, Plaintiff's first argument is without merit, and Plaintiff's motion for summary judgment on this ground should be denied. Additionally, the Court notes that Dr. Egitto primarily opined on Plaintiff's physical limitations, which are not at issue in this appeal.

B. Whether the ALJ Erred in Finding that Plaintiff's Intellectual Disability is not a Severe Impairment and Whether Plaintiff Met Her Burden of Providing Evidence of Disability

Defendant argues Plaintiff has "failed to meet her burden of providing evidence that her impairments prevented her from performing substantial gainful activity for at least twelve consecutive months during her alleged period of disability; *i.e.*, between her alleged onset date on December 18, 2013 and September 30, 2016, her date last insured." [DE 24, p. 4]. Defendant points out that Plaintiff's summary judgment arguments are based entirely on the ALJ's analysis of her mental (rather than her physical) limitations, and her only evidence within the relevant time period consists of "three pages of shorthand treatment notes from her primary care physician, Dr. Egitto, and a psychological evaluation outside the relevant period by psychologist, Dr. Cooper." *Id.* at pp. 4-5. Defendant maintains that Plaintiff has not shown how her diagnoses affected her ability to work. *Id.* at p. 5. Finally, he argues that, "based on the minimal evidence other than Plaintiff's subjective allegations, the ALJ reasonably concluded that Plaintiff 'did not carry her burden in establishing the existence of more than minimal limitation in any of the 'paragraph B' criteria'" and that "substantial evidence supports the ALJ's finding that Plaintiff did not prove that she had a severe mental impairment due to her intellectual functioning, depression, or any other mental condition." *Id.* at pp. 9-10.

Plaintiff, on the other hand, argues that the "ALJ, without proper explanation, erroneously found that the Plaintiff's learning disorder and valid IQ score of 61 are not severe impairments." [DE 21, p. 11]. Plaintiff contends that IQ testing is objective testing, that "the fact that the testing was done a year after the date last insured does not provide substantial evidence to support the ALJ's conclusion," that the "ALJ was required to presume that the Plaintiff had a full scale IQ score of 61 prior to the DLI, and that the ALJ should have found that Plaintiff's IQ score was

supported by medical evidence regarding deficits in functioning." *Id.* at pp. 12-13. According to Plaintiff, her IQ score of 61 "in itself is a significant nonexertional impairment," and the "ALJ failed to point to any evidence that would warrant a finding that the Plaintiff is not limited by her IQ score of 61. Therefore, the ALJ should have proceeded beyond step two in the sequential disability evaluation process." *Id.* at p. 14. Plaintiff argues that her hearing testimony regarding her limitations "support[s] a finding that the Plaintiff's intellectual disability or learning disorder is a severe impairment that significantly limits the Plaintiff's ability to work." *Id.*

In response, Defendant first argues that "psychological testing by Dr. Cooper after Plaintiff's date last insured, performed over the course of three evaluations for the Florida Department of Education Vocational Rehabilitation," did not "carry Plaintiff's burden of demonstrating intellectual limitations during her alleged period of disability." [DE 24, p. 7]. Defendant next points out that the ALJ did discuss Dr. Cooper's findings that Plaintiff's full scale IQ of 61 corresponded to her extremely low range of intellectual functioning; however, the ALJ determined that the findings were "not determinative of disability or limitations particularly when there is no medical evidence regarding deficits in functioning." *Id.* Defendant argues "Plaintiff failed to show that her intellectual functioning interfered with her ability to perform basic work activities." *Id.* Defendant further argues that, while the Eleventh Circuit has held that a valid IQ score creates a rebuttable presumption that the claimant satisfies the diagnostic description for intellectual disability, the ALJ, in this case, "implicitly rebutted this presumption when he explained that the record did not demonstrate that Plaintiff had 'more than a mild limitation in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing herself.'" *Id.* at pp. 7-8.

18

Finally, Defendant asserts that, even if the Court gives credence to Plaintiff's argument that her IQ past the date last insured should relate back to the relevant period, the evidence does not support deficits in functioning. [DE 24, p. 8]. According to Defendant, the ALJ did consider Plaintiff's testimony that she had been enrolled in special education, but no records were available, so the ALJ reasonably concluded that Plaintiff's low IQ score was not determinative of disability or limitations. *Id.*

In reply, Plaintiff claims that she suffers from intellectual disability and that she produced a "detailed IQ testing to support this impairment." [DE 26, p. 1]. Plaintiff asserts that, "[g]iven the permanent nature of this impairment, lack of available mental health treatment is of little significance" and that "IQ score[s] generally, remain constant throughout life time." *Id.* She argues that her "ability to perform only part-time work which involves preparing and bringing food and cleaning" does not indicate that her impairments are not severe or that her impairments do not interfere with the ability to work. *Id.* at pp. 2-3. Plaintiff also cites to Dr. Cooper's conclusion that she suffers from moderate to severe intellectual deficits and argues that even moderate deficits indicate a severe impairment which can significantly interfere with the ability to work. *Id.* at p. 2. She contends that her Special Education records were destroyed in 2004, but she was classified as Learning Disabled/Emotionally Handicapped. *Id.* at p. 3.

To meet Listing 12.05 for intellectual disability, "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). These requirements are referred to as the Listing's "diagnostic criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 ("Listing 12.05 contains an introductory

paragraph with the diagnostic description for [intellectual disability].") In addition to satisfying the diagnostic criteria, a claimant must meet one of the four severity requirements in paragraphs A through D of the listing. *Davis v. Berryhill*, No. 16-81872-CIV, 2017 WL 7796054, at *2 (S.D. Fla. Aug. 3, 2017); *see id.* § 12.05. Under paragraph C, a claimant must show that she has both "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. Under paragraph D, a claimant must show that she has both "[a] valid verbal, performance, or full scale IQ of 60 through 70 resulting in at least two of the following: 1. Marked restrictions of activities of daily living; or 2. Marked difficulties in maintaining social functional; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of an extended duration. . ." *Id.*

The Eleventh Circuit recognizes "that a claimant meets the criteria for presumptive disability under Listing 12.05(C) when the claimant presents a valid IQ score of 60 to 70 and evidence of additional mental or physical impairment." *Hodges v. Barnhart*, 276 F. 3d 1265, 1269 (11th Cir. 2001) (*citing Lowery v. Sullivan,* 979 F.2d 835, 838 (11th Cir. 1992)). However, a claimant is not required to present evidence that she manifested deficits in adaptive functioning prior to age 22 if she presents evidence of low IQ test results after age 22. *Id.* at 1266. The Eleventh Circuit has recognized a rebuttable presumption that IQ remains constant throughout life. *Siron v. Comm'r of Soc. Sec.*, 757 F. App'x 831, 833 (11th Cir. 2018) (citing *Hodges*, 276 F.3d at 1268–69). "Failure to address the validity of the score is an incorrect application of the law." *Leslie v. Colvin*, 196 F. Supp. 3d 1248, 1255 (N.D. Ala. 2016) (citing *Lowry*, 979 F 2d at 839); *Thomas v. Barnhart,* 2004 WL 3366150, at *2 (11th Cir. Dec. 7, 2004) ("It is therefore critical that an ALJ

specifically address and resolve the validity of an IQ score; if the IQ score is valid and meets or equals the criteria of a listed impairment, the ALJ can go no further.").

Here, in his decision, the ALJ noted that Plaintiff had testified that she had been enrolled in special education classes, but no records were available.[2] [R. 19]. The ALJ also wrote the following:

> Testing after the close of the relevant time period, done in October 2017, reflected a Full Scale IQ of 61, which is in the extremely low range of intellectual functioning. She was found overall to have moderate to severe intellectual, cognitive processing, neuropsychological, adaptive, achievement, emotional, and behavioral deficits (Exhibit B6F). While there is no reason to suspect this test score is invalid, it is not determinative of disability or limitations particularly when there is no medical evidence regarding deficits in functioning. The record lacks objective exam findings of any physical or mental limitations during the relevant period.

[R. 19].

Defendant argues that "the ALJ implicitly rebutted this presumption when he explained that the record did not demonstrate that Plaintiff had 'more than a mild limitation in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing herself' (Tr. 20)." [DE 24, p. 8]. However, this "implicit" rebuttal is simply insufficient pursuant to the applicable law. Moreover, the ALJ's explanations that there is "no medical evidence regarding deficits in functioning" and that the "record lacks objective exam findings of any physical or mental limitations during the relevant period" are incorrect in light of the record. Dr. Cooper did find deficits in functioning and objective findings of mental limitations, even if her exam was conducted outside of the relevant time period.

---

[2] The ALJ did not make a finding that the records never existed or that Plaintiff is lying about them. It appears undisputed that the records were destroyed and/or are currently unobtainable.

Clearly, Plaintiff's intellectual functioning test results from the relevant time period (which ended in 2016) would have been the same as the test results from 2017. Furthermore, in a case such as this one, there would never really be evidence of treatment for an intellectual disability other than educational records, which are unavailable here.

The ALJ clearly erred. However, it is not proper for the Court to determine if Plaintiff meets the factors of the introductory paragraph of Listing 12.05 or to make the initial determination of whether Plaintiff meets the requirements of deficits in adaptive functioning. The ALJ should make this determination in the first instance on remand. *See Sensat v. Berryhill*, No. 15-24727-CIV, 2017 WL 1215888, at *15 (S.D. Fla. Mar. 31, 2017). Additionally, in light of the above analysis, the Court finds no merit in Defendant's argument that summary judgment should be granted because Plaintiff failed to meet her burden of establishing that she is disabled.

C.   Whether the ALJ Failed to Perform a Proper Psychiatric Review Technique Analysis

Plaintiff cites the relevant regulations and case law regarding psychiatric review technique[3] analysis and argues that, in this case, "there is a colorable claim of mental impairment as the ALJ found that the Plaintiff has medically determinable impairments of bipolar disorder and learning disorder." [DE 21, pp. 15-16]. However, the ALJ's "analysis regarding the Plaintiff's difficulties adapting or managing herself is lacking." *Id.* at p. 16. Plaintiff points out that the ALJ is not a mental health professional and asserts that the ALJ is not trained to determine the clinical signs of severe depression or bipolar disorder. *Id.* at p. 17. Plaintiff contends that the ALJ found that there were no clinical signs of bipolar disorder, but, simultaneously, found this impairment to be a

---

[3] The psychiatric review technique is also referred to as "PRT" and the form that contains the psychiatric review technique is referred to as the "PRTF."

medically determinable impairment during the time period at issue. *Id.* According to Plaintiff, the ALJ was required to consider subjective evidence when performing the PRT analysis but failed to do so. *Id.* Finally, she argues that the ALJ erred in ignoring evidence from subsequent to the relevant time period since her intellectual disability and IQ score of 61 are lifelong conditions. *Id.*

Defendant argues that Plaintiff has failed to show legal error and that "Plaintiff faults the ALJ for not discussing the evidence further, when the reality is that, as the ALJ correctly recognized, there was very little evidence available to discuss." [DE 24, p. 14]. Defendant points out that "there were no objective mental findings at [Plaintiff's] subsequent appointment in December 2014" and no other medical records documenting any clinical signs of severe depression or bipolar disorder. *Id.* at p. 15. According to Defendant, "[e]ven if this Court believes the ALJ should have explained his conclusions in greater detail, remand for the purpose of further discussing the minimal evidence would not change the result and would be a waste of judicial and administrative resources. Thus, any deficiency with the ALJ's PRTF analysis was no more than harmless error." *Id.* at p. 16. Defendant also argues that an award of benefits would be improper and that "the only appropriate remedy if this Court does not affirm is to remand for further proceedings." *Id.*

In reply, Plaintiff argues that she is not contesting the ALJ's conclusion with regards to the area of adapting or managing herself by citing to a single treatment note from October 2014 regarding her subjective complaints. [DE 26, p. 4]. Rather, her complaint about pulling her hair out is supported by the doctor's observation that the Plaintiff had virtually no hair, Dr. Egitto's objective classification of Plaintiff's depression as severe, Dr. Cooper's tests showing an IQ score of 61, and Dr. Cooper's note that the Plaintiff's adaptive deficits put her at significant risk for

severe problems in the workforce and high potential social exploitation. *Id.* Next, Plaintiff contends that, "[t]o the extent that the Plaintiff's intellectual disability is affecting her ability to adapt, lack of medical treatment is not of particular significance, since, as mentioned *supra*, intellectual disability cannot be treated." *Id.*

The ALJ is required to use the "special technique" dictated by the PRTF for evaluating mental impairments. 20 C.F.R. § 404.1520a-(a). This technique requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a–(c)(3–4). The ALJ is required to incorporate the results of this technique into the findings and conclusions. 20 C.F.R. § 404.1520a-(e)(2). The Eleventh Circuit has held that "where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRTF and append it to the decision, or incorporate its mode of analysis into his findings and conclusions. Failure to do so requires remand." *Moore v. Barnhart*, 405 F.3d 1208, 1213–14 (11th Cir. 2005) (remanding because the ALJ failed to analyze or document the claimant's condition in two of the PRTF's functional areas, and such error could not have been harmless).

In the case at hand, the ALJ briefly discussed the record evidence [R. 19], and found as follows:

> Because the claimant has medically determinable mental impairments, I have considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in section 12.00C of Listing of Impairments (20 CFR, Part 404, Subpart P, Appx. 1). These four broad areas of mental functioning are known at the "paragraph B" criteria. The record does not show that the claimant has more than a mild limitation in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing herself. As noted above,

> the record contains minimal information from the relevant time period regarding the claimant's functioning. The claimant did not carry her burden in establishing more than minimal limitation in any of the "paragraph B" criteria. Because the claimant's medically determinable impairments caused no more than 'mild' limitations in any of the functional areas, they were nonsevere (20 CRF 404.1520a(d)(1)).

[R. 19-20].

However, Plaintiff did show a colorable claim of mental impairment, and the ALJ should have completed a PRTF. There is evidence of Plaintiff's IQ score of 61, as well as evidence that Plaintiff's working memory index, perceptual reasoning index, and processing speed index scores are in the extremely low range. [R. 297-98]. There is also evidence that Plaintiff's overall functioning academic skills are in the well below average range. [R. 298]. Additionally, Plaintiff's neuropsychological screening index score placed her in the moderately to severely impaired range. [R. 299]. Finally, Dr. Cooper opined that Plaintiff's moderate to severe intellectual, cognitive processing, neuropsychological, adaptive, achievement, and emotional and behavioral deficits place her at significant risk for severe problems in the workforce and high potential for social exploitation. [R. 301].

Defendant argues in its response to Plaintiff's Motion for Summary Judgment that, "[e]ven if this Court believes the ALJ should have explained his conclusions in greater detail, remand for the purpose of further discussing the minimal evidence would not change the result and would be a waste of judicial and administrative resources." [DE 24, p. 16]. First, Defendant seemingly concedes that the ALJ erred. Second, since the Court finds it necessary to remand this case to the Commissioner for the additional reasons explained above, the case should also be remanded as to the psychiatric technique review analysis.

## VI. CONCLUSION AND RECOMMENDATION

The undersigned finds it important to note that, in Defendant's papers, he repeatedly acknowledges, yet downplays, errors made by the ALJ in the ALJ's decision. Defendant's position is that the errors are harmless, especially in light of the lack of record evidence in this case. Furthermore, Defendant includes a whole section in his response to Plaintiff's motion for summary judgment stating that the Court should not award benefits if the Court agrees with Plaintiff but rather should remand the case for further findings. The undersigned finds that, taken together, the errors made by the ALJ necessitate remand, but the undersigned agrees that an automatic award of benefits would be improper.

In light of the foregoing, it is the recommendation of the undersigned that Plaintiff's Motion for Summary Judgment [DE 21] be **GRANTED**, and Defendant's Motion for Summary Judgment [DE 24] be **DENIED**. The undersigned also recommends that the decision of the Commissioner be **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation. Finally, the undersigned recommends that a separate judgment be entered.

## NOTICE OF RIGHT TO OBJECT

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge William P. Dimitrouleas. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v.*

*Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir.

R. 3-1 (2016).

      **RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach, Palm Beach

County, Florida, this 6th day of July 2021.

WILLIAM MATTHEWMAN
United States Magistrate Judge